UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———————

PAUL WELLS,

        Plaintiff,                              Case No.
                                                    Hon.

vs.

CITY OF BIRMINGHAM, a
Michigan municipality, JANA ECKER,
individually and in her capacity as
City Manager of the City of Birmingham,
and MARK H. CLEMENCE, individually
and in his capacity as Assistant City Manager
of the City of Birmingham, jointly and severally,

        Defendants.
_____/

  Jennifer L. Lord (P46912)
  Attorney for Plaintiff
  STERLING EMPLOYMENT LAW
  33 Bloomfield Hills Pkwy., Suite 250
  Bloomfield Hills, MI 48304
  (248) 644-1500
  jlord@sterlingattorneys.com
_____/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

      Plaintiff, Paul Wells, by his attorneys Sterling Employment Law, for his

Complaint against Defendants, submits as follows:

**Jurisdictional Allegations**

      1.     Plaintiff Paul Wells ("Wells") is a resident of the State of Michigan,

having his residence in Leonard, Oakland County, Michigan.

2. Defendant City of Birmingham (the "City") is a Michigan municipality, with its principal place of business located in Birmingham, Oakland County, Michigan.

3. Defendant Jana Ecker ("Ecker") is a resident of the State of Michigan, having her residence in Royal Oak, Oakland County, Michigan.

4. Defendant Mark H. Clemence ("Clemence") is a resident of the State of Michigan, having his residence in Clarkston, Oakland County, Michigan.

5. The City, Ecker, and Clemence are employers and Wells is an employee as defined by the Michigan Whistleblower Protection Act, MCL 15.361 *et seq*.

6. The City of Birmingham is a public body subject to the requirements of the Michigan Open Meetings Act, MCL 15.261.

7. The material events in controversy occurred in this District.

8. Plaintiff asserts a violation of his constitutional rights and seeks enforcement through 42 USC 1983.

9. This court has subject matter jurisdiction over his federal claim pursuant to 28 USC 1331, 1343.

10. This court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 USC 1367.

11. Venue is proper in this court pursuant to 28 USC 1391 (b) because all Defendants reside in the Eastern District of Michigan and the actions giving rise to the claims occurred in the Eastern District of Michigan.

## Introduction and Facts

12. Wells is employed as a Fire Chief/Emergency Manager for the City of Birmingham in Oakland County, Michigan.

13. Wells began working for the City as a firefighter on August 31, 1998.

14. Over the years, Wells received a series of promotions and was ultimately named Fire Chief/Emergency Manager on December 29, 2018.

15. His job performance has been exemplary for nearly 30 years.

16. Wells reports to the City Manager, Jana Ecker.

17. Ecker became the City Manager on July 1, 2023.

18. Mark Clemence is Assistant City Manager.

### Wells reported that two City owned parking structures had serious safety defects

19. Beginning in August 2023, Wells learned that the height of the interior top deck ramp railings in the Park Street and Pierce Street parking structure was significantly below Code.

20. The railings were only 23.5 inches high, and Code, in addition to MIOSHA required that they be 42 inches high.

21. Wells also learned that the Park Street structure top railing had large holes in the exterior panels, and loose railings throughout the structure that would not pass Code or MIOSHA requirements.

22. As Fire Chief, Wells had no independent authority to direct the Building, Parking, or other any other department to make the structure safe.

23. Wells told Ecker and other City officials that the low, damaged and loose railings were a serious safety hazard and that a fall from the structure could be deadly.

24. Wells requested the top deck effected areas be closed with a temporary barricade until the railings could be brought up to Code.

25. The Building Official told Ecker that Wells' proposed changes did not need to be made because the lower railing height was "grandfathered in."

26. The unsafe railing height was not "grandfathered in."

27. Wells repeatedly advocated that the unsafe Park Street and Pierce Streets structures be brought up to Code.

28. Ecker and Clemence became hostile towards Wells' repeated insistence that the unsafe parking garages be brought up to Code.

29. Ecker opposed installing plywood or other physical barriers because she believed that they were unsightly.

30. Despite Wells' advocacy, the Park Street railings were not brought up to Code until January 12, 2024.

31. In July of 2024, an individual was seriously injured after falling from the top level of the Park Street structure.

32. The July incident prompted Wells to push to have the City owned structures re-evaluated to ensure that they were safe for public use.

33. On July 15, 2024, Wells learned that the outer railings at the Pierce Street structure were 10 inches below code on all four levels.

34. As with the Park structure, Wells recommended that temporary plywood railing be installed to prevent a fall from the structure.

35. Wells was insistent that corrective action be taken immediately to fix the deficiencies at the Pierce structure.

36. City Manager Ecker demanded that Wells and others not put anything related to the safety issues in the parking structures in writing.

37. Ecker directed that the only discussion about the structures be done in person or on the phone so that the discussion(s) were not subject to the Freedom of Information Act ("FOIA").

38. Wells objected to that directive, telling Ecker that structuring communications to avoid FOIA was illegal and unethical.

39. Wells told Ecker that the delay in fixing the safety issues at the Park structure took months and that the City needed to move much faster to address the Pierce structure issues.

40. Ecker assured Wells that the remediation of the Pierce structure outer railings would proceed more quickly than what happened with the Park structure.

41. More than four months later, in November 2024, the repairs were still not completed.

42. Wells called a meeting with Ecker and other City officials on November 5, 2024 to address the ongoing safety concern.

43. At the meeting Ecker admitted that she had stopped the placement of a temporary plywood fix because she said they looked unsightly.

44. Ecker admitted that she had only received one bid for the permanent steel railing work instead of the required three.

45. Ecker and Clemence were increasingly hostile to Wells because of his continued advocacy.

46. The repairs to the Pierce Street structure outer railings were finally completed on or about May 15, 2025.

47. The repairs to the Pierce Street inner top ramp railings were completed on or about December 15, 2024, over 15 months from the time it was first reported by Wells.

48. In December 2024, Ecker presented Wells with his annual performance evaluation.

49. The evaluation came over five months late.

6

50. The evaluation contained false and negative critiques about his performance.

51. Wells submitted a comprehensive rebuttal to the evaluation.

52. Ecker assured him that it would be included in his personnel file.

53. Ecker then placed Wells on a personal improvement plan and falsely disciplined him for theft for unauthorized use of Emergency Leave.

54. Local media submitted a Freedom of Information Act request for his file on July 24, 2025.

55. The City's response to the FOIA request did not include Wells' rebuttal comments and other missing attachments to the performance evaluation.

### Wells discovers serious problems with multiple fire hydrants and watermains

56. In 2025, Wells learned that fire hydrants had been turned off and watermains gated down or shut off across the City.

57. Wells suspected that the hydrants and watermains had been rendered inoperable or partially inoperable during City work on the watermains.

58. Wells does not possess the authority to order the Department of Public Safety or other departments to make repairs to hydrants or watermains.

59. In April of 2025, Wells ordered fire hydrant flow testing.

60. On June 24, 2025 Wells had a meeting regarding the findings with Ecker and other City officials.

61. On July 9, 2025 Wells instructed the Fire Marshal to do hydrant flow testing on Pilgrim Ave, only to find that the hydrants were flowing 30 percent of the normal flow due to a closed water main at Maple Rd.

62. Wells presented the new findings to Ecker and other City officials on July 9, 2025.

63. Wells reported that the conditions with the watermains and hydrants "compromise fire protection and present serious safety risks to our residents and personnel."

64. Wells explained: "Should a hydrant fail during an incident, crews would be forced to stretch over 1000 feet of four-inch supply line from Arlington – crossing Maple [Road] to reach a reliable water source."

65. Wells further reported that the conditions with the hydrants and watermains "not only jeopardizes life and property but also places firefighters at increased risk."

66. The problems that Wells identified included:

    a. The hydrant at Quarton and Chesterfield was found turned off;

    b. The hydrant at Redding and Woodward was found turned off;

    c.    The water main along Oak – supplying a large portion of the west side – was gated down by over 50% for several months, possibly longer;

    d.    Newly installed water mains near Shirley/Arlington were gated down or turned off at Lincoln and/or Maple, reducing flow by more than 50%.

67. Wells impressed upon the City, Ecker, and Clemence how serious these defects were: "In my 27 years with the City of Birmingham, including having personally conducted thousands of hydrant flow tests, I have never before encountered a single hydrant shut off or water main gated down, let alone such a pattern of valves being improperly closed or mains being restricted without proper follow-up.

68. Ecker and Clemence were enraged with Wells for his direct and urgent demand for assistance in immediately resolving the hydrant and watermain failures in the City.

69. On July 16, 2025, Wells filed a formal complaint about the deficiencies in the City's water supply system to the Michigan Department of Environment, Great Lakes, and Energy ("EGLE").

70. The City and Ecker placed Wells on paid administrative leave on July 17, 2025, just eight days after his pointed report to City officials and one day after his report to EGLE.

71. Ecker named Matt Bartalino as acting Fire Chief.

72. Wells remains on leave as of the filing of this Complaint.

9

73. A review of the City Commission minutes, agendas, notices, and Commission packets from June 2025 – September 2025 do not reflect public or closed session meetings authorizing the placement of Wells on paid administrative leave.

74. On July 24, 2025, Ecker commented in a media report about Wells' involuntary leave in Downtown Magazine.

75. Ecker falsely stated: "This decision was not made lightly, but was necessary in light of the responsibility to ensure the safe, effective, and efficient operation of the city."

76. Word of Wells' involuntary leave and Ecker's comment spread widely throughout the close-knit Fire Safety community in the State of Michigan.

77. Wells suffered tremendous reputational loss because of the City of Birmingham's and Ecker's actions.

## COUNT I

**Violation of 42 USC 1983**
**First Amendment Violation**
**Harassment and Retaliation for Exercising First Amendment Rights**

78. Plaintiff incorporates the preceding paragraphs by reference as though fully restated herein.

79. As a public employee, Wells is protected by the First Amendment of the United States Constitution in that he may not be harassed or placed on

administrative leave in retaliation for engaging in constitutionally protected activity, including providing truthful information to Ecker and other City officials.

80. Between August 2023 and July 2025, Wells engaged in constitutionally protected activities, described in detail above when he provided truthful information and evidence to City officials on matters of public concern.

81. Wells' protected activities were not taken as part of his official duties.

82. Wells' protected speech was a substantial or motivating factor in Defendants' decision to place him on administrative leave.

83. Defendants had no adequate justification for their adverse action against Wells.

84. At all times relevant to this action, Defendants were acting under the color of state law.

85. Ecker's decision to place Wells on administrative leave constitutes the establishment of an unconstitutional policy which led to the adverse employment action which is the basis of Wells' complaint.

86. Ecker, as City Manager of the City of Birmingham, has established a policy, custom, and practice of retaliating against employees, including Wells.

87. At all times relevant to the actions alleged in this case, it was clearly established and known to Ecker that it was unlawful to subject a public employee

11

to adverse employment action because that employee provided truthful information and evidence to City officials.

88. Defendants acted in deliberate indifference toward Wells' constitutional right to Free Speech when they engaged in the adverse employment actions described in this Complaint.

89. As a result of the unconstitutional activities described in this Complaint, Wells has suffered severe reputational damage, substantial loss of fringe benefits, including retirement benefits, annual compensation and annual raises, and emotional distress, humiliation, and mental anguish.

WHEREFORE, Wells requests:

A. An Order of the Court reinstating him to active duty;

B. An Order of the Court awarding him compensatory damages;

C. An Order of the Court awarding him punitive damages for the willful and wanton disregard of his federally protected rights;

D. An Order of the Court awarding him the costs of litigation, interest on any amounts owed them and his statutory attorney fees; and

E. An Order of the Court granting him such other relief that he is found to be entitled to.

## COUNT II

## Violation of the Michigan Whistleblower Protection Act

90. Plaintiff incorporates the preceding paragraphs as though fully restated herein.

91. At all times relevant to this matter, Defendant Ecker, Defendant City of Birmingham, and Defendant Clemence were Wells' employers as defined by the Michigan Whistleblower Protection Act ("WPA").

92. Wells engaged in activity protected by the WPA when he engaged in the reporting described above.

93. Defendants were aware of Wells' protected activities before subjecting him to adverse employment action(s).

94. Defendants harassed and subjected Wells to adverse employment action because he engaged in activity protected under the WPA.

95. As a result of Defendants' unlawful conduct under the WPA, Wells has suffered severe reputational damage, substantial loss of fringe benefits, including retirement benefits, annual compensation and annual raises, and emotional distress, humiliation, and mental anguish.

WHEREFORE, Wells requests:

A. An Order of the Court reinstating him to active duty;

B. An Order of the Court awarding him compensatory damages;

  C. An Order of the Court awarding him the costs of litigation, interest on any amounts owed them and his statutory attorney fees; and

  D. An Order of the Court granting him such other relief that he is found to be entitled to.

## COUNT III

### Violation of the Open Meetings Act

96. Plaintiff incorporates the preceding paragraphs as though fully restated herein.

97. The Open Meetings Act requires a public body to deliberate and make decisions at an open meeting unless there is an applicable exception.

98. Defendants have the burden of proving an exception to the Act's requirement that all decisions and deliberations be made in an open meeting.

99. A public body may meet in closed session to consider adverse action of an employee if the employee requests a closed session.

100. Defendants failed to hold an open or closed session to deliberate about their decision to place Wells on administrative leave.

101. Defendants have concealed the substantive discussion of the placement of Wells on administrative leave.

102. The Court should invalidate the Defendants' decision to place Wells in leave because Defendants did not comply with the Act's open meeting requirements.

14

WHEREFORE, Wells requests this Honorable Court:

    A.    Invalidate Defendants' decision to place Wells on administrative leave;

    B.    Enjoin Defendants' future violations of the Act pursuant to MCL 15.271;

    C.    Award Wells court costs and attorney fees pursuant to MCL 15.271.

## COUNT IV

## Defamation

103. Plaintiff incorporates the preceding paragraphs as though fully restated herein.

104. Defendants have made false, misleading, and defamatory statements about Plaintiff to the media and others.

105. The false statements were made with actual malice.

106. The false statements have caused Plaintiff severe harm.

WHEREFORE, Plaintiff requests an Order awarding him compensatory damages.

## RELIEF REQUESTED

Plaintiff Paul Wells demands judgment against Defendants as follows:

    A.    Compensatory damages in whatever amount he is found to be entitled;

    B.    Exemplary damages in whatever amount he is found to be entitled;

C. Punitive damages in whatever amount he is found to be entitled;

D. Equitable relief provided under the MichiganWhistleblower Protection Act;

E. Equitable relief provided under the Michigan Open Meetings Act;

F. An award of interest, costs and, and where applicable, statutory attorney fees; and,

G. Whatever other legal or equitable relief is just.

## DEMAND FOR JURY TRIAL

Plaintiff Paul Wells, by his attorneys Sterling Employment Law, requests a trial by jury.

Respectfully submitted,

STERLING EMPLOYMENT LAW

By:/s/Jennifer L. Lord
Jennifer L. Lord (P46912)
Attorney for Plaintiff
33 Bloomfield Hills Pkwy., Ste. 250
Bloomfield Hills, MI 48304
(248) 644-1500
jlord@sterlingattorneys.com

Dated: November 14, 2025

16